## Richmond

JACK R. TURNEY, JR., AND RACHEL H. TURNEY v. GEORGE SMITH, JR. AND DORA P. SMITH.

April 26, 1971.

Record No. 7388.

Present, Snead, C.J., Carrico, Gordon, Harrison, Cochran and Harman, JJ.

*Henry C. Mackall (Mackall and Mackall, on brief), for appellants.*

*Mark P. Friedlander (Harry P. Friedlander; Friedlander, Friedlander & Brooks, on brief), for appellees.*

HARMAN, J., delivered the opinion of the court.

Rachel H. and Jack R. Turney, Jr. (sellers or the Turneys) are appealing from a decree that awarded Dora P. and George Smith, Jr. (purchasers or the Smiths) specific performance of a real estate sale contract involving a residence and approximately 1.5 acres of land on Ballantrae Lane in McLean, Fairfax County, Virginia. The

controlling question in the case is whether time was of the essence in the performance of the contract.

The Turneys and the Smiths began negotiations on Sunday, October 20, 1968, using the Turneys' realtor, Conrad R. Harper (Harper), as an intermediary during the ensuing week. The Turneys had been advised by their "tax attorney" that in order to defer a capital gains tax on the sale of the Ballantrae Lane residence a closed transaction for tax purposes was required by Saturday, October 26, 1968.[1]

The Smiths and Harper were aware of the fact that the Turneys desired to have a closed transaction for tax purposes by October 26, 1968, and the Turneys, on several occasions during the week of negotiations, suggested ways that the Smiths could help them achieve their goal, e.g., the Turneys suggested placing luggage in the house and picking up a key on or before the 26th of October. The record does not establish that the Turneys ever told the Smiths exactly what was expected of them in this regard or that the sale was contingent upon the Turneys achieving a tax deferral.

Late Friday night, October 25, 1968, the Turneys and the Smiths reached an agreement and executed a contract for the sale of the Ballantrae Lane property. Harper was present at the execution of the contract and aided in its preparation.[2] That night Harper arranged for the Smiths to see Edward Kendall Stock (Stock), "the settlement attorney", the next morning.

Paragraph 5 of the contract provides that "(s)ettlement shall be made at the office of Realtor or at office of settlement att'y on or before 26 Oct, 1968, *or as soon thereafter as title can be examined and necessary documents prepared, with allowance of a reasonable time for seller to correct any defects reported by the title examiner.*" (emphasis added). Paragraph 10 provides that "(t)his Contract of Purchase constitutes the entire agreement among the parties and may not be modified or changed except by written instrument executed by all the parties, including Realtor."

When the contract was executed on Friday night no written commitment or instructions had been received from the bank indicating the precise terms and conditions upon which it would finance the property, and the Smiths had not yet arranged for an examination

---

[1] The Turneys had purchased a residence in Washington, D.C., in October, 1967. See § 1034 of the Internal Revenue Code of 1954.

[2] Harper provided a "Virginia Association of Realtors Real Estate Purchase Contract" form which he filled out and the parties signed. Mr. Turney is an attorney.

of the Turneys' title. Mention was made during the contract negotiations that the Smiths could assume an existing mortgage on the property. The existing mortgage covered, in addition to the tract in question, other adjoining property owned by the Turneys, and if assumed, presumably the Turneys would want their adjoining land released by the bank. The Turneys, in preliminary talks with a bank officer, had been advised that the bank was unwilling to have the Smiths assume the existing mortgage which bore a 6% interest rate, but that the bank was willing to finance $48,000.00 of the sale price at a 7% interest rate and release the existing mortgage.[3]

Paragraph 1 of the contract provides that "(t)he purchase price of the property is sixty-five thousand Dollars ($65,000), and such purchase price shall be paid as follows: All cash above $48,000 7% first deed of trust . . . which purchaser agrees to assume." Apparently paragraph 1 represents Harper's endeavor to incorporate the financing arrangements in the contract insofar as they were understood by the parties.

The Smiths went to Stock's office Saturday morning, October 26, 1968, as Harper had arranged. The Turneys' original tract on Ballantrae Lane had been approximately six acres. Earlier in October they sold a one acre lot off the six acre tract to another purchaser. Stock was familiar with the Turneys' title to the six acre tract because he had represented the other purchaser earlier in October and had then examined the Turneys' title to the six acre tract and certified the lot title to the other purchaser. However, on Saturday Stock could not supplement his earlier title examination and certify title to the Smiths since the Fairfax County Clerk's Office was closed.

Stock understood the Turneys' tax predicament from phone conversations with Harper the preceding evening and with the Turneys that morning before the Smiths' arrival. Stock's testimony does not indicate that the Turneys gave him definite instructions as to what must be accomplished that day for them to receive a tax deferral.

Stock, prior to the arrival of the Smiths at his office, had prepared a deed, a deed of trust and a note which the Smiths examined after they arrived. Stock had also prepared settlement statements which were necessarily incomplete.

The Smiths' testimony indicates that they were willing to do whatever was necessary on the 26th to perform their part of the contract.

---

[3] The existing mortgage was for a principal sum of $50,000.00, but the Turneys' payments had reduced the principal sum to approximately $48,000.00.

They testified that they were prepared to pay the cash portion of the purchase price if necessary.

Stock did not ask the Smiths to sign anything and he did not ask them to deposit any money in escrow. The Turneys, who were aware of the meeting at Stock's office, were not present, choosing instead to supervise movers who were removing their belongings to their Washington, D. C., residence. After an hour with the Smiths, Stock concluded that nothing further could be accomplished before the following Monday. The Smiths understood that Stock would have the Turneys sign the deed later that day and that final settlement would be on Monday. The Smiths left McLean for Sweet Briar, Virginia, to visit their daughter.

Later Saturday Stock delivered the deed to the Turneys who were to sign it and return it to him. Harper advised Stock on Monday morning that the Turneys had not signed the deed and had called off the sale because they said enough had not been accomplished to qualify them for a tax deferral.

Harper informed the Smiths that "the sale was off" on Sunday, October 27, 1968, when they returned from Sweet Briar.

■ Time is not of the essence in the performance of a real estate sale contract unless expressly made so by the terms of the contract, or unless in fairness it should be implied from the conduct of the parties or from the nature and circumstances of the agreement. *E.g.*, *Cranford* v. *Hubbard*, 208 Va. 689, 694, 160 S.E.2d 760, 764 (1968); *Reutt* v. *Jordan*, 207 Va. 869, 872, 153 S.E.2d 197, 200 (1967); *Sims* v. *Nidiffer*, 203 Va. 749, 752, 127 S.E.2d 85, 87 (1962).

Manifestly the contract in question does not expressly make time of the essence, and we do not believe that this term should be implied from the conduct of the parties or from the nature and circumstances of the agreement. The plain words of the agreement refute all suggestion that the parties intended time to be of the essence. The agreement does not require any acts of performance on or before the 26th of October.

The Turneys never specifically stated what they expected the Smiths to do on or before October 26, and the record does not indicate that the Turneys ever said that the contract was contingent upon particular acts being performed on or before that date. Furthermore the Turneys knowingly absented themselves from what they should have regarded as the crucial meeting on the 26th, had they considered time of the essence.

The Smiths, since October 26, 1968, have remained ready, willing,

able, prompt and eager to perform their part of the contract. Since time was not of the essence in the performance of the contract, the trial court did not abuse its discretion in granting specific performance.

In their bill of complaint the Smiths, in addition to their prayer for specific performance, alleged that they had suffered damages in the sum of five thousand dollars because of the wrongful failure of the Turneys to timely perform their contract.

In its final decree the trial court directed the execution and delivery of "a general warranty deed for the land mentioned and if said interest rate exceeds 7% at the time of settlement on the existing deed of trust then the cost of interest above 7% that the plaintiffs (Smiths) would have to pay on account of said deed of trust for the life of the deed of trust shall be deducted from the cash payment to the defendants (Turneys) . . ."

While it is true that paragraph 1 of the contract refers to a "$48,-000 7% first deed of trust" and the evidence reveals that a bank officer had orally agreed to make a $48,000 loan at 7% secured by a deed of trust on the lot to be conveyed to the Smiths, there is no evidence in the record that the interest rate which the Smiths would have to pay on their loan had increased so there is nothing in the evidence to support such a provision in the final decree. Counsel for the Smiths, in his final argument, suggested to the court that the Smiths might have to pay 7-½% or 7-¾% on the deed of trust of $48,000 because of the failure of the Turneys to timely complete the transaction.

It is elementary that he who alleges damages has the burden of proving such damages and the quantum thereof with reasonable certainty. Where, as here, he fails to carry this burden, he is not entitled to recover. The decree will, therefore, be modified in this respect.

*Decree modified and affirmed.*